May it please the Court, Jason Alexander appearing on behalf of Appellant, The Erection Company. With me today is co-counsel, Mr. Robert Burke. I'll refer to my client today as TEC, T-E-C, as we do in debriefs. TEC stands before you today asking two things, to reverse the district court's ruling denying its FAA petition to compel arbitration and reversing the district court's ruling granting the defendant's partial motion for summary judgment. While other questions are in play here, TEC believes the key question is based on the objective acts and statements of the parties. Was a binding contract consummated on April 6th? We believe the answer to that is yes. Now let me ask you, Mr. Alexander, which of these two theories do you embrace, or maybe both of them? Do you claim that the e-mail from Jones Sr. accepted an offer made by Henkin, Case 1? Or do you claim that Henkin's e-mail accepted an offer by Jones Sr.? I believe both do, Your Honor. I think objectively there is sufficient evidence. Well, wait a minute. It's not the same contract. If Jones Sr. accepts Henkin's offer, it's not the same contract as Henkin accepting Jones Sr.'s e-mail, is it? I believe you do, Your Honor, because the last e-mail... Well, let me tell you why I think you're wrong. In Jones Sr.'s e-mail, which reads, Think on that just for a second. That means that Exclusion 4 says that He goes on to say, strangely enough, that language, if that's your point. And then he goes on to say, That's a different deal completely from what he's just accepted in Exclusion 4. So you can't have both. You can accept either Exclusion 4, or you can accept Industry Standards. But what you can't do is accept both. Now, it may be probable that what Mr. Jones did was forget a very important word in his e-mail, which is the word not. It reads a lot better to say, We will not use your language in your e-mail. If that had been in there, then objectively, he would be offering only Industry Standards as far as testing and inspection. But that's not what he said. And it seems to me that given the history of the negotiations of these people, the early notice of intent saying, We need to have a fully executed and signed contract, covers that possibility that the exchange between the contracting parties had to be signed, sealed, and delivered before it was effective. Now, why am I wrong? Well, let me start with the first part of that question, Your Honor, about which e-mail constitutes the acceptance. All right. If you read Mr. Jones, Sr.'s e-mail as imparting new terms, then yes, the okay e-mail from W&W is the acceptance. Well, wait. Let's stop right there, because that suggests, in fact, there's not an acceptance. I mean, offer acceptance, counteroffer is not an acceptance. This appears to be — it's hard to know what to make out of, and there's a lot of argument about what it means to say okay. When can we expect the executed subcontract to be returned? But when the response from Mr. Jones, Sr. seems to indicate that there's not agreement on this additional term he's talking about, I have the same problem Judge Bea has figured out. I don't know what the deal is as to all the terms. And for you to say, well, we'll go back to the earlier acceptance when Mr. Jones, Sr. promptly identifies an issue that appears to be a subject of disagreement, how can you disregard the disagreement he's just expressed? Thank you for the question. And I will eventually get back to your question about the letter of intent. With respect to the negotiations, you need to look at all of them, the totality of the circumstances. And there's two interpretations you can take from Mr. Jones, Sr.'s e-mail. One is it is imparting new terms. And if that's the case, the okay e-mail that the Vice President of Defendants sent is accepting those new terms. But the terms are inconsistent, counsel. What I'm trying to tell you is that Mr. Jones gives two different terms regarding inspection and testing. One is, we're going to accept your language on exclusion for, although it's useless. Right? That means that TEC does not pay for any inspection and testing unless the work doesn't meet standards. That's one term. Then TEC comes back with a second portion. Industry standards allow a percentage of testing. That means they will pay a percentage of testing and inspection. Those are two different deals. If you interpret them as separate terms. Well, then if you don't, if you think that there's a possibility of ambiguity in that counteroffer, and you have in the background a letter of intent saying we don't have a deal until the sign's sealed and delivered, then you say the intent of the parties was never to accept anything short of that. What TEC's first position on this issue is those four, six e-mails about those issues are interpretation questions as to the agreement. What the agreement really requires. TEC has one position. The defendant has the other. ER 613 is the written agreement that TEC asserts was agreed to and ultimately consummated by the totality of the circumstances concluded on April 6th. Now, I hope I've answered your questions. I'd like to get to Judge Bea's question about the letter of intent effect. First of all, that letter of intent was an offer. It was never accepted by TEC. It was never rejected either. Technically it was. On January 20, later on, it was TEC sent a revised letter of intent back to the defendant. However, by that time, per the express terms of the letter of intent, it had already expired. So there was no longer an offer to reject. Whether it was agreed to or not, why can't we take that as an expression by one party that we're not considering ourselves bound, there's not a meeting of the minds until there's a signed, sealed, delivered formal agreement. And if we hear that from one party, well, isn't it fair to say we shouldn't infer something less than that? Where have they ever indicated a willingness to enter into a binding contract short of that? When the letter of intent expired, and that letter of intent included the four statements that the defendant is relying on for its stated intent, those statements also expired. There must be some effect. But then they expired. If someone says, I'm not going to be bound until there's a signed subcontract, why do we have to assume, okay, you didn't take it, so now I'm willing to sign up for just anything? I mean, why doesn't that express the intent of one party to the agreement? Because it expired. If they had sent a letter saying, we'd like to start negotiations, and here is our intent that we are never going to be bound until a signature is on the piece of paper? The email you're pointing to is the key email that commits that party, says, okay, when can we expect the executed subcontract to be returned? I mean, that emphasizes their belief that the subcontract means something. We disagree. They don't think they didn't really care if there was a signed subcontract or not. We don't believe so. The letter of intent compared to the signed subcontract are two different animals. The letter of intent is an offer to pre-agree. Starting at 311 and through 4-6, that's when the parties are talking about the actual construction contract. Secondly, the stated intent was in an offer that per its expressed terms expired. There has to be some type of effect of that expiration. And the law in Oregon, the parties agree that Oregon law controls on the question of whether or not a contract was consummated. The Oregon Realty and Britt v. Thorson case is cited by both parties, I think, provides the clearest guidance to the Court on what the law is. And that states that a contract, if all essential terms are agreed to, is effective regardless of whether or not it's signed. And they further go on to state, if there is a condition precedence to the enforceability or consummation of a contract, you must have a positive agreement or a clear understanding. Well, how can you have a clear understanding the parties have agreed if one party says we're not bound until there's a signed agreement? How can you or how can you not? As a matter of evidence or factual inference, if one party is saying I'm not bound until there's a signed agreement, where is it you can find a meeting of the minds short of a signed agreement? Now, you can say, well, that party's changed its position, but to tell me that the utter of intent has expired doesn't indicate that they've changed their position at all. Objectively, if the offer that the party gave expired and included the stated intent and the stated intent, those stated intents also expire. Now, if we were sitting in front of you today and you said, well, that is a factual matter. If I say here's a letter of intent, but I'm not going to be bound until we have a signed agreement, and you let the letter of intent go, why should it be fair to assume just because you didn't accept the letter of intent within the time period, I don't care anymore whether I have a signed subcontract? That's just not a logical inference. By itself, I agree. But if you look at all of the other acts and communications. We have everything that shows that W&W intended to be bound. All of their acts. We have e-mails saying these are the concessions we are willing to make. Here are the changes. But we are willing to make. That's different than we have made. We've got an agreement already. I don't see anything where they've said we've got an agreement, we're bound by this. At the very end of the discussions, Tech sends an e-mail saying, glad to have this behind us. W&W never objects to that. And the very final e-mail is the 08-OK e-mail, when can we expect the executed subcontract? And in addition to the communications. This was a long history of negotiations where W&W would send terms, Jones or TEC would change them, and they'd go back and forth and back and forth. And the communication wasn't the best in English. So it's not unusual for W&W to say, let's see what your executed subcontract now is and let's take a look at it. I think that's how one can conceive that OK telegram or e-mail. Isn't that possible? Under all of the circumstances, we respectfully disagree, Your Honor. I think your time. You want to say something else? I'd like to, if the Court submits, I'd like to say remain in time for rebuttal. May I hear from Defendant Appellee? Good morning, Your Honors. May it please the Court. My name is Leonard Feldman for the appellee W&W Steele. I'd like to pick up on the questions that the panel has already asked, because obviously I agree with much that has already been said. But I want to say something more about the letter of intent. It has never been W&W's theory in this case that the letter of intent was accepted in the sense of an offer acceptance contract. It wasn't accepted. What happened was W&W sent the letter of intent, and this is at ER 465 to 67, to TEC. TEC then marked up that letter of intent, changed some of the provisions with regard to insurance, this is at ER 469 to 72, and sent it back to W&W. So there's two ways to see this. One is that there is a very clear expression of intent by W&W that it would not be bound in the absence of a contract that was signed by both parties, and TEC acquiesced in that expression of intent. Well, what about Mr. Alexander's argument that, well, when the letter of it goes something like this, when the letter of intent expired, all of its terms expired, too, including the expression of intent? Yeah. If the letter of intent were a binding contract, and that's what we were talking about, then the expiration of the letter of intent might have legal significance, but that's not what happened here. The letter of intent was an expression of intent that, as I was saying, was either acquiesced in by TEC or affirmatively adopted by TEC, because when TEC sent it back, it, too, was making a statement to W&W that it would not be bound in the absence of a contract that was signed by both parties. And the March 11 correspondence, if anything, confirmed that the parties were operating under that understanding. TEC has taken the March 11 letter from Hankins as somehow abrogating the letter of intent. And, in fact, I would say exactly the opposite. It did not abrogate the letter of intent. It, in fact, confirmed it, because what Hankins of W&W did on March 11 was it sent an unexecuted copy of its standard subcontract to TEC and said, you sign this and send it back to us. Then we will sign it and we will have a, quote, ''fully executed copy.'' W&W didn't say that it would have an agreement when TEC signed. W&W said it would have a fully executed copy when both parties signed. So the parties proceeded throughout with this understanding, and again, it frankly doesn't matter whether you call it an expression of intent by W&W or an understanding by both parties, but it was a clear framework for their discussions that there would not be a binding agreement until both parties had signed. And then on April 6th, I mean, candidly, it is an absolute mess. And if you look at there's one set of e-mails here where you can see the entire thing from start to finish, it's ER 636 to 37. You know, this is the e-mail that my opposing counsel mentioned on 637, glad to have this behind us. Well, two paragraphs before that, Mr. or Ms. Spillman is saying that she or he, I'm sorry, I don't know if Dale is a man or a woman, but this makes it read better and clearly outlines the intent. So there's a statement there that changes are being made. Glad to have this behind us, but here's some more changes. Kennedy, what page are you on now? I'm on ER 637. All right. And then you've got Mike Hankins responding, and he says, I've reviewed your request, and I don't see the need to modify what I've submitted to you. They're still arguing about what the document is. And then we have the e-mail that was discussed earlier. Industry standards allow for a percentage of retesting, and we will not waive that. So, again, there's more terms being thrown in. In that same e-mail What were the industry standards percentage? Flesh that out for me, would you please? I think it depends on who you ask is part of the problem, but what Tech was saying is that they might or might not be liable for retesting, and it depends on the circumstances that prompted the retesting. So they're still talking about who has to pay for testing costs, whether it's in the contract or out of the contract. The way I read that is that a certain percentage of the installation can be retested and inspected at Tech's cost. And I don't know what the industry standard is, 15% or 20% or 50%. But my understanding of the April 6 discussion regarding exclusion four was that Tech wouldn't pay for any of that retesting and stamp. That's what your people agreed to, unless it didn't meet project specifications, and then they would pay for all of it. I think that's a reasonable interpretation of what's going on, but it is clear that the parties are not in agreement. I couldn't agree more. And in addition, in that same e-mail, this is Jones indicating, Mike, in addition, we will not be submitting any further CPA information. Our bonding rate is 1%. So there's a couple things going on in this e-mail. One is the pushback on retesting, and the other is we're not going to provide this information. And then you have this e-mail that says, okay, followed by a question. Okay, what? Okay, we understand you're not going to give us the information we've requested. That has nothing to do with a meeting of the minds. Or okay, we understand your position on industry standards. The letter of intent solves all of those problems. It is the framework under which the parties were operating, and it makes clear, as confirmed on March 11, that there would not be a meeting of the minds in a contractual sense in this case in the absence of two signatures. And I should add that at the same time these e-mails are going back on April 6, submittal number 4 is being provided by TEC to W&W through an entirely different chain of command Submittal number 4 indicates that TEC can change the schedule at its discretion and that if it accelerates the schedule, W&W is required to make sure the materials are there for that acceleration. Even TEC was not at a point where it could credibly say that there is a meeting of the minds, because it is renegotiating in these e-mails with Mr. Hankins, and it is renegotiating in the other context that I've mentioned. There simply is not a meeting of the minds here. That, as the district court very eloquently put it, this is a 24-page decision. It's well reasoned. It goes through all of TEC's arguments. That, as the district court said, is entirely dispositive with regard to the first issue, which is the petition or motion to compel arbitration. In the absence of a binding agreement, there's no basis upon which to compel arbitration. And the second issue that's presented on appeal, which is whether there was a breach of contract or a potential claim for breach of contract. It's axiomatic that if you don't have a contract, you cannot have a claim for breach of contract. And the district court properly addressed that issue, too. Having denied the motion to compel arbitration, there was no basis under the Federal Arbitration Act to stay the case. The district court logically proceeded to the motion for summary judgment, which was timely filed, concluded that there was no contract, and dismissed that claim as well. Kennedy, Mr. Friedman, had Mr. Jones put in the word ''not'' in his April 6th e-mail to read, ''We will not use your e-mail as clarification of the language in Exclusion IV. It is poorly worded and unclear.'' Rejecting your view, and then putting in, ''Industry standards allow for a percentage of retesting and we will not waive that. And we will not give you CPA information.'' Could Mr. Hankin have accepted those terms and said, all right, we'll give up on our interpretation of Exclusion IV, we'll take your industry standards, all right, we'll give up on our request for financial information, we'll go along with the ''without any CPA information.'' He could have done that. He could have done and said, send me an executor's subcontract that has those terms. Right. He could have done that, and had he done that, it would have been a conclusion of the party's negotiations, and that's the key. But you still say it would have to be signed by your people. Right. And that's exactly what happened in the Rennick case that we cite in our briefs, where the parties met, they had a settlement meeting, there was an agenda that said we are not going to have a binding agreement here absent approval by our respective boards of directors. It was a different articulation of intent there than we have here. But when you have that kind of expression of intent, what precedes it, I think, can best be described as negotiations. And so if, as you put it, Mr. Jones had said we will not use your e-mail and we had a better expression and response other than just the word okay, something, you know, clear, we would have had a conclusion of the negotiations, which would then be subject, in the same sense it was in Rennick, to the further requirement. In Rennick it was board of directors' approval. Here it's the signature requirement. Kennedy, but wouldn't that simply be ministerial if they had a deal? No. It wouldn't have been ministerial. And I think that's the distinction between comment A of the restatement, section 27, and comment B of the restatement, section 27. There are cases, and Tech has cited them, where the memorialization or the signature is a simple ministerial act. But in cases like this, where there is a clear expression that there has to be signatures for there to be a binding agreement, it is no longer a ministerial act. It is the absolute fundamental requirement for a binding contract. And that's the distinction between the cases they've cited and the cases we've cited. The cases we've cited, I submit, are directly on point, consistent with the district court's analysis, and compel the result that the district court found. I haven't used up my time, but I think I've addressed all of your questions. I'd be happy to respond to any further questions if you have any. Roberts. Doesn't appear we have any, so we'll let you go and ask for Tech's attorney to offer his rebuttal. Thank you. There's just a few issues I'd like to touch base on in my rebuttal. The first issue goes to defendant's defense that not all terms were agreed to. I'd like to remind the Court that it's the key word that was left out is the essential terms. Ministerial or small side issues don't have to be agreed to. It's the essential terms. And an essential term goes to the substance of a contract, and if breached, defeats the object of the contract. All of the issues the parties were discussing in their e-mails leading up to the 460-K, including submittal 4, are not essential terms. Like, for example, in submittal 4, that was one of exclusion 4. Excuse me, exclusion 4. And with the time I have left, I'll leave it at that. They are not essential terms. We believe the written subcontract agreement covers the parties' essential terms. So you're saying that inspection and testing in this contract is not an essential term? In the context the parties are discussing in those e-mails. The written subcontract agreement covers those issues, and if there's an interpretation as to what is required or not, there's a dispute resolution provision in the subcontract agreement so the parties can resolve it. So whether Tech gets its industry standards provision or whether it has W&W's exclusion unless there's nonperformance per the specification is not going to be resolved in dispute resolution? I notice I'm over time. May I answer the question? Yes. Yes, Your Honor. If those issues, if there's a dispute, it is not going to defeat the object of the subcontract to erect the steel. There is a provision in the subcontract to resolve disputes that arise in any construction project, and that's the purpose of the dispute resolution provision. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Tashima, Clifton, Bea